## MRS. W. L. PENDLEY v. STATE.

No. A-10286.     Sept. 1, 1943.
(141 P. 2d 118.)

Stephenson & Stephenson, of Okemah, and Hayden C. Covington, of Brooklyn, N. Y., for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for defendant in error.

JONES, P. J.    The defendant, Mrs. W. L. Pendley, was charged in the court of Common pleas of Tulsa county with unlawfully hindering and forbidding the carrying out of the ceremonial for saluting the American flag, formulated according to law by the State Superintendent of Public Instruction, was tried, convicted, the punishment left to the court, who thereupon sentenced the defendant to serve 60 days in the county jail, from which judgment and sentence an appeal has been taken to this court.

70 O.S. 1941 §§ 1091 and 1092 provide:

"The pupils of every public, private, parochial and denominational school in the State of Oklahoma, shall by appropriate ceremonial, to be formulated by the State Superintendent of Public Instruction, be taught the proper reverence and respect for the American Flag."

"Any teacher neglecting to display said flag or carry out said ceremonial and any person forbidding or hindering the display of said flag or the carrying out of said ceremonial shall be subject to discharge or removal and shall also be punished by a fine of not less than one hundred dollars or more than five hundred dollars, or by imprisonment in the county jail for not less than sixty days and not more than six months or both."

The proof of the state showed that the State Superintendent of Public Instruction, pursuant to the authority vested in him under 70 O. S. 1941 § 1091, supra, had prescribed a proper salute for the American flag as a ceremonial to be used in all of the public schools in Oklahoma. In describing this ceremonial and the salute by the school children, the city superintendent of schools at Tulsa testified:

"The flag is generally brought in by a member of the Boy Scouts and the Girl Scouts, and the leader holds his hand over his heart, and the children repeat the pledge which says: I pledge allegiance to the flag of the United States of America, and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all."

The proof further showed that a seven-year-old child of the defendant, who was in the public school of Tulsa, refused to participate in the salute to the flag, giving as her objection that she was one of Jehovah's Witnesses and that because of her religious belief she could not participate in the flag salute because of the scriptural admonition forbidding her to bow down to any graven image.

In lieu of the ceremonial prescribed by the State Superintendent, the defendant appeared before the board

of education of the city of Tulsa and asked that her child, and others of her faith, be permitted to make the following pledge:

"I pledge my unqualified allegiance to Almighty God, I respect the flag of the United States and acknowledge it as a symbol of freedom and justice to all. I pledge allegiance to the laws of the State of Oklahoma that are consistent with God's law."

Because of the refusal of the seven-year-old daughter of defendant to salute the flag, in accordance with the ceremonial prescribed by the State Superintendent, she was expelled from school and these charges filed against defendant.

Proof on behalf of defendant showed that she was an ordained minister of Jehovah's Witnesses; that she had tried to teach her child the word of the Bible. The witness quoted from the Book of Exodus, wherein it is stated, according to her testimony:

"Thou shalt have no other gods before me.

"Thou shalt not make unto thee a graven image, nor any likeness of anything that is in heaven above, or that is in the earth beneath, or that is in the water under the earth; thou shalt not bow down thyself unto them, nor serve them; for I, Jehovah thy God am a jealous God, visiting the iniquity of the fathers upon the children upon the third and upon the fourth generation of them that hate me, and showing loving kindness unto thousands of them that love me and keep my commandments."

It is the contention of the defendant that the statute in question is being construed and applied in this case so as to deprive her of her constitutional rights of freedom of speech and freedom of religious worship.

The specific question here presented was decided by the Supreme Court of the United States on June 14, 1943,

in the case of West Virginia State Board of Education et al. v. Barnette, 63 S. Ct. 1178, 87 L. Ed. —. The law of that opinion is set forth in the first two syllabi, as follows:

"1. The action of a State Board of Education in requiring public school pupils to salute the flag of the United States while reciting a pledge of allegiance, under penalty of expulsion entailing a liability of both pupil and parents to be proceeded against for unlawful absence, transcends constitutional limitations and invades the sphere of intellect and spirit of which it is the purpose of the First and Fourteenth Amendments of the Constitution to reserve from all official control.

"2. Freedoms of speech and of press, and of assembly, and of worship, are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect."

The same flag ceremonial was prescribed in West Virginia, pursuant to a statute similar to the Oklahoma statute. We quote from some of the language used by Mr. Justice Jackson in disposing of that case:

"The freedom asserted by these respondents does not bring them into collision with rights asserted by any other individual. It is such conflicts which most frequently require intervention of the state to determine where the rights of one end and those of another begin. But the refusal of these persons to participate in the ceremony does not interfere with or deny rights of others to do so. Nor is there any question in this case that their behavior is peaceable and orderly. The sole conflict is between authority and rights of the individual. The state asserts power to condition access to public education on making a prescribed sign and profession and at the same time to coerce attendance by punishing both parent and child. The latter stand on a right of self-determination in matters that touch individual opinion and personal attitude.

"* * * Here, however, we are dealing with a compulsion of students to declare a belief. They are not merely

made acquainted with the flag salute so that they may be informed as to what it is or even what it means. The issue here is whether this slow and easily neglected route to aroused loyalties constitutionally may be short-cut by substituting a compulsory salute and slogan. * * *

"There is no doubt that, in connection with the pledges, the flag salute is a form of utterance. Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design. The state announces rank, function, and authority through crowns and maces, uniforms and black robes; the church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment. Symbols of state often convey political ideas just as religious symbols come to convey theological ones. Associated with many of these symbols are appropriate gestures of acceptance or respect: a salute, a bowed or bared head, a bended knee. A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn. . . .

"It is also to be noted that the compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind. It is not clear whether the regulation contemplates that pupils forego any contrary convictions of their own and become unwilling converts to the prescribed ceremony or whether it will be acceptable if they simulate assent by words without belief and by a gesture barren of meaning. It is now a commonplace that censorship or suppression of expression of opinion is tolerated by our Constitution only when the expression presents a clear and present danger of action of a kind the state is empowered to prevent and punish. It would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence. But here the power of compulsion is invoked without any al-

legation that remaining passive during a flag salute ritual creates a clear and present danger that would justify an effort to muffle expression. To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind. . . .

"National unity as an end which officials may foster by persuasion and example is not in question. The problem is whether under our Constitution compulsion as here employed is a permissible means for its achievement.

"Struggles to coerce uniformity of sentiment in support of some end thought essential to their time and country have been waged by many good as well as by evil men. Nationalism is a relatively recent phenomenon but at other times and places the ends have been racial or territorial security, support of a dynasty or regime, and particular plans for saving souls. As first and moderate methods to attain unity have failed, those bent on its accomplishment must resort to an ever-increasing severity. As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be. Probably no deeper division of our people could proceed from any provocation than from finding it necesary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard. . . .

"The case is made difficult not because the principles of its decision are obscure but because the flag involved is

our own. Nevertheless, we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization."

This decision of the Supreme Court of the United States, being expressly in point, controls in the disposition of the instant case. Regardless of any personal views this court may entertain concerning the reasonableness or unreasonableness of the defendant's views, we shall adhere to the ruling of the highest court of the land. It is sound in principle and consonant with constitutional provisions.

We are advised that since the rendition of this opinion the State Superintendent of Public Instruction has entered an order rescinding that part of his former regulation subjecting a child to expulsion from school for failure to participate in the flag ceremonial.

For the reasons hereinabove given, the judgment of the court of common pleas of Tulsa county is reversed and remanded with instructions to dismiss.

BAREFOOT, J., concurs.    DOYLE, J., absent.